**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **O.G. and J.C.**

**No. 21-0357** (Randolph County 17-JA-080 and 17-JA-082)

**MEMORANDUM DECISION**

Petitioner Grandmother A.W., by counsel Gregory R. Tingler, appeals the Circuit Court of Randolph County's April 5, 2021, order denying her motion for permanent placement of O.G. and J.C.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Lee Niezgoda, filed a response in support of the circuit court's order. The guardian ad litem, Brian W. Bailey, filed a response on the children's behalf in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in denying her motion for permanent placement of the children and in failing to consider O.G.'s wishes when determining permanent placement.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In October of 2017, the DHHR filed an abuse and neglect petition against the respective fathers of O.G. and J.C. and the biological mother of O.G., J.C., and K.W., alleging abuse and neglect.[2] As a result of those proceedings, the mother of all three children voluntarily relinquished her parental rights in December of 2017. In January of 2018, the circuit court held a hearing, during which it accepted the voluntary relinquishment of J.C.'s father's parental rights and terminated the parental rights of O.G.'s father. At the hearing, the nonabusing father of K.W. consented to a transfer of guardianship to petitioner.

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

[2]K.W. is not at issue in this appeal.

1

Upon removal from their parents, the children were placed with petitioner in October of 2017. Following the termination of the parents' parental rights, the permanency plan for O.G. and J.C. became adoption by petitioner. The circuit court conducted several placement review hearings over the subsequent three years, including in May, August, and November of 2018; and February, June, August, and December of 2019. Throughout this period, the DHHR, Child Protective Services ("CPS") workers, and service providers conducted regular home visits with petitioner to monitor the cleanliness and safety of petitioner's home, as issues with these conditions were identified early in the proceedings. The DHHR presented evidence at the December of 2019 review hearing that petitioner would allow the condition of the home to deteriorate, then make improvements after being warned that the children's placement with her was in jeopardy. After making the improvements, petitioner would again allow the home's condition to deteriorate.

In January of 2020, the DHHR filed an abuse and neglect petition against petitioner, alleging that fifteen-year-old O.G. had been sexually abused by a family member and informed petitioner of the abuse but that petitioner failed to take appropriate action against the family member. According to the petition, O.G.'s therapist reported that O.G. disclosed to her that the child's uncle had sexually abused her multiple times and that she had told petitioner about the abuse. Based upon O.G.'s disclosures during therapy, the child was interviewed at the local Child Advocacy Center ("CAC") during which she provided more details concerning the sexual abuse. During the interview, O.G. disclosed that she first told petitioner about the abuse when she was six years old, but petitioner did not believe her. She further stated that when she was ten years old, she told petitioner that the abuse was continuing, and she thought petitioner believed her at that time. However, the DHHR alleged that petitioner did not report the abuse to anyone outside of the family. According to the petition, petitioner claimed that O.G. only disclosed the sexual abuse to her on one occasion—in a letter when she was ten years old. Petitioner claimed that she informed the child's mother about the alleged abuse but that the mother told her not to believe the child because O.G. was a "drama queen." The DHHR alleged that in response to the child's disclosures, petitioner confronted the child's uncle, the alleged perpetrator, but took no further action. The DHHR further alleged that petitioner allowed the child's uncle to have continued contact with O.G., even consenting to overnight visits in his home.

The circuit court held a preliminary hearing in February of 2020, during which the court granted petitioner supervised visitation with O.G. and K.W. but ruled that petitioner could not have any visits with then two-year-old J.C. until the guardian advised that such visits would be consistent with her best interests.[3] The court also ordered petitioner to participate in a parental fitness evaluation.

The parental fitness evaluation was conducted in March of 2020, and the resulting report indicated that petitioner exercised "poor judgment by not reporting allegations of sexual misconduct by her brother-in-law toward her granddaughter [O.G.]." According to the report, petitioner's poor judgment was not based upon a psychological condition, but rather, stemmed from petitioner's feeling that threats she made to the child's uncle were sufficient to deal with the

---

[3]Petitioner acknowledges that she has not seen or visited with J.C. since her removal in January of 2020, as the guardian never consented to visits with the child.

allegations of sexual abuse. The report further indicated that petitioner had the "parental capacity to care, protect and change in order to provide adequately for [the] children."

In December of 2020, the circuit court dismissed the abuse and neglect petition against petitioner after she relinquished guardianship of K.W. to the custody of her nonabusing father. At the time of the dismissal, the court had not adjudicated petitioner as to the petition. After dismissing the petition, the court found that the sole remaining issue in the proceedings was the permanent placement of O.G. and J.C.

The circuit court held a permanent placement hearing in March of 2021, during which petitioner presented evidence that O.G. had sent three letters, between June of 2020 and February of 2021, to the court in which she requested that she return to petitioner's custody. Next, in response to the allegations, petitioner admitted that when O.G. was ten years old, she wrote a letter to petitioner disclosing that her uncle had repeatedly "tried" to sexually abuse her since she was six years old. Petitioner testified that she still possessed the letter in which O.G. made the disclosures of abuse. Under questioning, petitioner admitted that the only action she took following the disclosure was to confront the uncle and threaten him as a means of preventing him from sexually abusing O.G. in the future. Specifically, petitioner testified that she threatened the uncle with "bodily injury if [she] found out he had done it." In defense of her failure to report the sexual abuse, petitioner explained that "there is a difference between trying and doing."

Next, the DHHR presented evidence that concerns about the cleanliness and the state of petitioner's home were constant issues throughout the proceedings, despite several interventions by CPS workers. A CPS worker testified that at the beginning of the proceedings, there was extreme clutter in the home, and she worried that the clutter prevented infant J.C. from having a place to play or lay down. The CPS worker admitted that the issues were discussed with petitioner, she was receptive to instruction, and the conditions were improved. Another CPS worker testified that she visited the home on multiple occasions in 2019 and had similar concerns about the condition of the home.

Further, the DHHR presented evidence that petitioner took no action to protect O.G. following the child's disclosures of sexual abuse and allowed the child's uncle to have further access to the child. The DHHR also demonstrated that although O.G. was attending therapy, petitioner failed to provide the child with the emotional support and therapy tailored to her status as a victim of sexual abuse. Finally, the DHHR presented evidence that petitioner failed to initiate services to assist in J.C.'s development while the child was in her care.

After hearing the evidence, the circuit court cited to the conditions of petitioner's home and found that "there have been repeated historical concerns about the condition of the home from a cleanliness and clutter perspective." The court found that while "there were some minimal improvements for short periods of time when [petitioner was] prompted by the [DHHR], the conditions would then deteriorate again." The court further found that after petitioner learned of the sexual abuse allegations against O.G., she "took no action to protect [O.G.] from further contact with [the uncle]," including a lack of therapy and counseling. The court further found that then two-year-old J.C. was suffering from developmental delays at the time of her removal and was deficient in every milestone. However, the court found that J.C. had begun to thrive in her new

foster placement and was being provided with recommended services. As a result, the court found that the best interests of O.G. were served by remaining in her foster care placement, with a plan for legal guardianship by the caregiver that included continued visitation with petitioner. The court further found that it was in the best interest of J.C. to remain in the care of her foster family, who intended to adopt her. The circuit court memorialized its decision in its April 5, 2021, order. Petitioner now appeals this decision.[4]

The Court has previously held:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court's findings were clearly erroneous in light of the record viewed in its entirety and that it was in the children's best interests to be placed in her care. Petitioner emphasizes that "she was initially found to be a suitable person for the permanent placement of [the] children in October of 2018" and "the adoption process was well underway when the children were removed in January of 2020." Petitioner also asserts that the abuse and neglect petition against her was dismissed in December of 2020 and that she was never adjudicated as an abusing guardian. Finally, petitioner asserts that the DHHR's evidence about the condition of her home, failure to protect O.G. from abuse, and best interests of J.C. were insufficient to deny her custody of the children. Upon our review, we find no error in the circuit court's denial of petitioner's motion for permanent placement of the children.

---

[4]The record below indicates that permanency for these children remained unresolved for over three years in these proceedings. This Court has often stressed the necessity for rapid finality in abuse and neglect proceedings. Thus, we remind both the circuit court and the parties that "[c]hild abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security." Syl. Pt. 1, in part, *In the Interest of Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991). We have also recognized "matters involving the abuse and neglect of children shall take precedence over almost every other matter with which a court deals on a daily basis, and it clearly reflects the goal that such proceedings must be resolved as expeditiously as possible." Syl. Pt. 5, in part, *Carlita B.*

4

West Virginia law sets forth a preference for adoption of a child by their grandparents if possible. *See* W. Va. Code § 49-4-114(a)(3).[5] "[West Virginia Code § 49-4-114(a)(3)] contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such placement is not in the best interests of the child." Syl. Pt. 7, in part, *In re P.F.*, 243 W. Va. 569, 848 S.E.2d 826 (2020) (internal citation omitted). We have reiterated that the "grandparent preference" is not absolute and that placement must be in "the best interests of the child, given all circumstances of the case." *Id.* at 570, 848 S.E.2d at 827, Syl. Pt. 8, in part.

Here, we find no error in the circuit court's conclusion that permanent placement with petitioner was not in the children's best interest. First, petitioner takes issue with the circuit court's findings that the conditions of her home were used as a basis to deny her placement of the children. Petitioner notes that the court conducted seven placement reviews throughout 2018 and 2019 and continuously found it was in the best interests of the children to live with her. However, petitioner acknowledges that the DHHR presented four witnesses during the permanent placement hearing in March of 2021 who testified as to the concerning conditions inside petitioner's home. Each witness testified that they addressed concerns with petitioner, including extreme clutter and a lack of suitable sleeping locations for the children. The DHHR further demonstrated that each of the workers addressed their concerns with petitioner but—despite some short-term improvements in the condition of the home—petitioner regressed and failed to maintain a suitable home over a lengthy period of time. As such, although it was not the primary cause for denying petitioner permanent placement of the children, there was clear and convincing evidence that petitioner's home was regularly unsafe and unclean.

Next, petitioner acknowledges that she was denied permanent placement of the children due to her failure to protect them from risk of sexual abuse. However, petitioner argues that testimony and evidence during the permanent placement hearing did not support the circuit court's ultimate findings. Specifically, petitioner argues that the child's uncle—who was alleged to have committed sexual abuse against O.G.—had not been arrested and that there was no pending CPS investigation into those allegations. We do not find these arguments persuasive. We have previously noted that the standard of proof at various stages of abuse and neglect proceedings is the clear and convincing evidentiary burden. *See* Syl. Pt. 1, *In re Joseph A.*, 199 W. Va. 438, 485

---

[5]For purposes of any placement of a child for adoption by the department, the department shall first consider the suitability and willingness of any known grandparent or grandparents to adopt the child. Once grandparents who are interested in adopting the child have been identified, the department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker. If the department determines, based on the home study evaluation, that the grandparents would be suitable adoptive parents, it shall assure that the grandparents are offered the placement of the child prior to the consideration of any other prospective adoptive parents.

W. Va. Code § 49-4-114(a)(3).

S.E.2d 176 (1997) (requiring the DHHR to establish conditions of abuse and neglect by clear and convincing evidence in order to satisfy the burden of proof at adjudication); *State v. C.N.S.*, 173 W. Va. 651, 656, 319 S.E.2d 775, 780 (1984) (requiring clear and convincing evidence to support termination of a parent's rights at disposition). Here, the DHHR's evidence of petitioner's failure to protect O.G. from the threat of sexual abuse was sufficient to satisfy this burden. O.G. stated in her CAC interview that petitioner was aware of sexual abuse that was perpetrated upon her as a child and that petitioner failed to take action when she was just six years old. Further, O.G. explained in her CAC interview that she again told petitioner about the sexual abuse when she was ten years old. Based upon O.G.'s disclosures, the circuit court found that petitioner had allowed the child's uncle to sexually abuse O.G. as a minor. We agree that the evidence supports this finding under the applicable evidentiary standard.

In further support of her argument, petitioner points out that the parental fitness evaluation report documented her "parental capacity to care, protect and change in order to provide adequately for [the] children." While we acknowledge this conclusion, the evidence that petitioner failed to protect O.G. from sexual abuse as a child is nonetheless extremely troubling and sufficient to overcome this speculative assessment. Further, petitioner's explanations for her past actions—including her threats against the child's uncle—demonstrate her inability to appropriately respond to the child's disclosures. The circuit court was concerned that petitioner did not have the capacity to protect the children based upon her inability to protect O.G. from sexual abuse while O.G. was a minor in petitioner's care. Although petitioner assured the circuit court that she would protect the children, the evidence showed that she had already failed in the past to protect minors in her care from sexual abuse. Ultimately, the circuit court properly weighed this evidence, giving more weight to O.G.'s earlier testimony in its findings of fact, which is a credibility determination we will not undermine. *See Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) ("A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations.").

Finally, petitioner argues that the circuit court erred in failing to give due consideration to O.G.'s request for permanent placement with petitioner. Petitioner states that O.G. was sixteen years old at the time of the permanency hearing and had expressly advised the court of her preferred guardian. Petitioner contends that O.G. "repeatedly begged" the circuit court for permission to live in petitioner's home, but those "requests went unheeded." As such, petitioner alleges that the lower court violated West Virginia Code § 44-10-4(a), which provides:

> If the minor is above the age of fourteen years, he or she may in the presence of the circuit or family court, or in writing acknowledged before any officer authorized to take the acknowledgment of a deed, nominate his or her own guardian, who, if approved by the court, shall be appointed accordingly.

While petitioner is correct that O.G. requested placement with her, the circuit court specifically found that permanent placement with petitioner would not be in the children's best interests, which is, ultimately, the controlling determination on this issue. *See Kristopher O. v. Mazzone*, 227 W. Va. 184, 192, 706 S.E.2d 381, 389 (2011) ("[T]he best interests of the child is the polar star by which decisions must be made which affect children."). Further, we have held

6

that "while a child over the age of fourteen may have an absolute right to *nominate* his or her own guardian, a court is not bound to *appoint* such guardian." *In re: Antonio R.A.,* 228 W. Va. 380, 386-87, 719 S.E.2d 850, 856-57 (2011) (citation omitted); *see also Kathryn C. v. Mark C.*, No. 12-1542, 2013 WL 5676636 (W. Va. Oct. 18, 2013)(memorandum decision). Indeed, the disturbing facts surrounding the many findings of sexual abuse committed against O.G., including petitioner's knowledge of some of these incidents, support the permanent placement of the children outside petitioner's custody. Based on the circuit court's extensive findings regarding petitioner's inability to protect the children from repeated acts of sexual abuse, we find no error in the circuit court's denial of her motion for permanent placement of the children.

For the foregoing reasons, we find no error in the decision of the circuit court, and its April 5, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: January 12, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Evan H. Jenkins
Justice William R. Wooton